## J. B. MILLET CO. v. ANDREWS.

1. FRAUD—RESCISSION—EVIDENCE—OPINIONS.

A notice of defense attached to defendant's plea, in an action of assumpsit, on a contract to purchase a set of books and a vacant lot on installments, alleging that plaintiff's agent represented that the lot was in a suburb of New York city, that it was easy of access by steam and trolley lines, that only eight lots had been set apart for the city of which defendant was a resident, and seven had been sold to desirable customers, that the lots were valuable and rapidly increasing in value, charging, further, that the land was, in fact, difficult of access, not in a suburb, and worthless, and defendant signed the contract relying on the representations of plaintiff's agent, and on discovering their falsity rescinded the agreement, sufficiently alleged the defense of fraud.

2. SAME—FACTS STATED.

Plaintiff's claim that the statements made by the agent amounted to no more than puffing and did not constitute fraud was untenable.

3. SAME—EVIDENCE—PAROL EVIDENCE.

Testimony tending to prove fraud as a part of the inducement to enter into a contract is admissible in evidence to impeach the validity of the contract, and is not subject

to the objection that parol evidence to vary or contradict its terms is incompetent.

4. SAME—EVIDENCE OF SIMILAR TRANSACTIONS.

Testimony relative to similar representations and statements made to a witness by plaintiff's agent about the same time that the parties executed the contract, *held*, competent to show intent.

5. SAME—DELAY—LACHES.

Where defendant gave notice of rescission soon after the contract was executed, stating his reason therefor to be because the binding of the books was unsatisfactory, and, subsequent to the commencement of an action against him, discovered the falsity of representations made to him by plaintiff's agent, and filed a plea setting up fraud as a defense, he was not barred by laches from the right to rescind.

6. SAME—INSTRUCTIONS TO JURY.

Plaintiff was not prejudiced and had no ground to complain of the charge of the court which advised the jury that the contract on which action was brought was valid and enforceable unless defendant established fraud by a preponderance of the evidence, that his own testimony alone was not sufficient to prove fraud, instructing the jury further that the contract was executed and if they found for plaintiff the verdict should be for the amount named in the writing.

Error to Muskegon; Barton, J., presiding. Submitted January 13, 1913. (Docket No. 86.) Decided May 28, 1913.

Assumpsit in justice's court by the J. B. Millet Company against Willis W. Andrews on a contract in writing, specially declared upon. Judgment for defendant. Plaintiff brings error. Affirmed.

*Cross, Vanderwerp, Foote & Ross,* for appellant.

*R. J. Macdonald (William H. Simpson,* of counsel), for appellee.

STEERE, C. J. The plaintiff is a corporation organ-

ized under the laws of New Hampshire, and, according to its letter heads, "publishers," located at Boston, Mass. In July, 1911, it brought suit in justice's court for the county of Muskegon, Mich., on the following written order:

"Date 10—27—10.
"J. B. MILLET COMPANY,
    "120 Boyleston street, Boston, Mass.:
    "Please deliver to me one complete set (12 vols.) of Spofford's 'Historic Characters and Famous Events,' in red buckram binding, for which I agree to pay you $48.00. Title of said books to remain with J. B. Millet Company until paid for in full.
        "[Signature]    W. W. ANDREWS,
            "[Residence]    157 Fourth street.
    "Business address, 9 and 11 Second street, city of Muskegon, State of Michigan.
    "Received on account $4.00.
    "$4.00 per month.
        "J. W.
    "This order is unconditional and irrevocable, and no promises or representations have been made to me other than expressed herein. Make first, or cash payments, to agents; remaining payments to us or our representatives.
    "In consideration of the payment of $48.00 under the terms specified in the above agreement, we agree to deliver to Willis W. Andrews, a warranty deed, free of all cost, for a building lot 25x100 feet, situated at Middlesex Downs, Englishtown, N. J.
    "It is guaranteed that these lots are high and dry and free from swamps and wet land.
        "J. B. MILLET COMPANY,
            "Per John Waters."

This order was obtained from defendant by one John Waters, an agent of plaintiff's, who approached defendant in Muskegon on the 27th day of October, 1910, and interested him by first introducing a real estate proposition claiming that he represented certain property in a suburb of the city of New York, owned by a company which was preparing to institute a campaign of selling lots to wage earners and salaried

people who, by reason of their circumstances, were living in and around New York in tenements; that preparatory thereto some lots were being sold in certain cities of the West to select customers; that eight lots had been assigned to the city of Muskegon, seven of which had already been sold to desirable parties, and he now offered to defendant the last one as he was obliged to leave Muskegon that night. He represented that the lots were easily accessible and could be reached from New York City by steam and trolley lines in 40 minutes; that their value was rapidly increasing, and within a very short time they would have greatly appreciated. In the course of the conversation he produced a blueprint plat of the addition which he called "Middlesex Downs," showing a railroad seemingly running diagonally across the plat. On this plat appeared a place marked Englishtown on one side of the railroad, and, Waters stated, Middlesex Downs, lying adjacent on the other side of the railroad, was within the corporate limits of Englishtown. After he had talked some time in regard to this real estate, and defendant, becoming interested in the proposition, was inclined to give it favorable consideration, Waters stated that the lots about which he had been talking could only be secured in connection with a set of books published by plaintiff, which he was also handling. After some further discussion defendant, relying on the representations made to him as to the lots, concluded it was a good investment and signed the order above given, paying thereon $4. He testifies that the land proposition only interested him, and the statement relative to the lots was the inducement which led him to sign the order.

In due time defendant received a communication from plaintiff, dated November 9, 1910, acknowledging receipt of the order, being in part as follows:

"We beg to acknowledge receipt of your order for

175 MICH.—23.

one set of Historic Characters and Famous Events, purchase price $48, together with a building lot in Middlesex Downs property, for which we inclose a certificate."

The certificate stated that on payment of $48 for the set of books plaintiff would give defendant free of further cost "a warranty deed of one building lot 25x100 feet, situated at Middlesex Downs, Englishtown, N. J. Land guaranteed to be high and dry and free from swamps and wet land." Some time later defendant received the set of books referred to, cloth bound, 12 in number. After examining them he wrote plaintiff a letter on December 8, 1910, saying:

"The books recently ordered arrived a few days ago while I was out of the city. I am somewhat disappointed in them, as the binding is not up to my expectations. Have concluded that I would prefer to cancel the contract, and of course I realize that I will lose the four dollars already paid by so doing.

"Kindly advise me whether I shall return books to you, or what disposition you wish to make of them."

In answer to a letter of plaintiff's advising that it proposed to draw upon him, defendant stated that it was useless to do this as he would not honor the draft; that he had notified it on December 8th he preferred to cancel the contract and did not now intend to carry it out; also advising the plaintiff that the books were there in as good condition as when received, and suggesting that it order them returned and deliver up the contract. In reply to this plaintiff wrote defendant a letter of some length, in part as follows:

"This contract of yours was purchased outright from our agent just as we might have bought your promissory note; furthermore the books are in every way equal to the sample shown and were sold to you at the regular catalogue price. * * * You may or may not consider that the books are worth $48, but that is not the point. They were sold to you at the

regular price and you agreed to pay $48 for them, which is the only point involved.

"Our hold upon you is based upon the contract in question, and that hold we can enforce through legal process, if necessary."

Inclosed with this letter was a report, or legal opinion, made by certain attorneys as to the validity of the contract, which plaintiff advised defendant to read.

It is the claim of defendant that the contract or order signed by him is void because he was induced to sign it by deceit, misrepresentation, and fraud; that he took no particular interest in the books offered, and did not care for them, only considering the proposition by reason of Waters' representations as to the desirability of the lots, which would have been a satisfactory purchase at the price proposed if those representations had been true; but that they were in fact false; that Middlesex Downs, so called, when traced out and finally located, proved to be a tract of land mostly swamp and unimproved, located in New Jersey about 68 miles from New York and three miles from a little village called Englishtown; that lots in said tract were then valueless as such, and had no prospective value; that there was no railway service between New York and said land, which was a remote, low, wild, and worthless swamp, excepting a small portion which was sandy and poor. In confirmation of the falsity of the representations made by Waters, a witness named Banninga, who resided in Muskegon and was engaged in the real estate business, testified:

"I first learned that the plaintiff had a deal with this man about January, 1911. I was in New Jersey on the 2d day of August, 1911. I knew that Mr. Andrews had a suit with this company then. I went to this land by electric line to Newark, N. J., from New York City. I left in the morning; then, going to Newark, N. J., there took a train for Jamestown Junction, on steam road; then took a freight line to Englishtown, arriving

there at 2:05. There was a wait at each junction, at one place 2 hours, and another place 2½ hours. I then went by horse and carriage to Middlesex Downs; it was from 3½ to 5 miles from Englishtown, a sandy road without any improvement whatever. Englishtown is a small village of about 350 inhabitants, although they claim about 600. It is 69.7 miles from New York. There is no electric line from New York to Englishtown, or to Middlesex Downs, nothing nearer than Trenton, N. J., 25 miles distant. There is no town nearer to Middlesex Downs than Englishtown. The only way from Englishtown is by carriage. Middlesex Downs, according to the signs out there, is a tract of land I should think about 240 or 300 acres and fenced in by a rail fence. About one-third of it is a field, and the balance is swamp with uncut popples on it. Here is a high knoll of about 45 or 50 acres, possibly 60, upon which stands an old farmhouse, built 75 years ago and in a dilapidated condition. This land is not staked. The only improvement is that on the trees and on the fence posts here and there are nailed up street signs, named after Presidents of this country, Monroe, Washington, and Adams. This field has been sown to rye, but the rye had been cut off that year. The soil is very light sand, and absolutely worthless for farming purposes. It is all woods and swamp until you get to this hill."

Witness further testified that he had some knowledge of the value of land in and about New York; that Middlesex Downs in tracts 25x100 feet was absolutely worthless; that it was worthless as a whole or in fractions;

"Isn't worth the taxes.  *  *  *  There was no indication of the laying out of a plat, nothing more than the nailing up of the signs. If it hadn't been for these signs and the sign telling that it was Middlesex Downs and lots for sale, I wouldn't have seen the lots at all. I think they said that they were to apply to 142 Broadway, N. Y., to buy these lots. I went there and couldn't find any place where there was any lots for sale. The plaintiff's name was not attached to that sign; it was some real estate firm in New York City;

it was the same number that this man Waters told me
where he came from."

During the progress of the trial timely objections
were made and exceptions taken to raise and save all
questions now presented in plaintiff's assignments of
error, which center on the proposition that a verdict
should have been directed in its favor because it is
undisputed that defendant signed the contract sued
upon and plaintiff had delivered the books and faith-
fully observed on its part all requirements of said
contract. At the conclusion of the evidence plaintiff's
counsel moved the court to strike out all the testimony
claimed to have been erroneously admitted and in-
struct the jury to render a verdict for $44, being the
balance shown to be its due according to the terms of
the contract. This motion was denied, and the ques-
tion of fraudulent representations was left to the
jury, resulting in a verdict for defendant of no cause
of action.

It is the claim of plaintiff that all testimony offered
by defendant as to representations made by Waters
before or at the time of signing the contract, and all
proof as to the falsity of such representations, are
incompetent and immaterial and their admission was
error; that the contract was in writing and should
govern, and no testimony tending to change or vary
the terms of the written contract was competent.
These objections are stated more specifically as fol-
lows:

"Because said testimony by parol evidence tends to
vary, alter, and contradict an unambiguous written
contract between the parties; because it is an attempt
and would have the effect to extend a written war-
ranty by parol evidence; because defendant's notice
under his plea of the general issue is insufficient to
warrant a defense on the ground of fraud and deceit;
because the defendant, having entered into a written
contract with the plaintiff upon the face whereof ap-

pears the words, 'No promises or representations have been made to me other than as expressed herein'; and the plaintiff having acted under said contract and in reliance thereon, defendant is estopped from claiming that any such promises or representations were in fact made; and, if the defense of fraud and deceit was ever open to defendant, he has waived it by his laches in failing to rescind the contract and return the books to plaintiff within a reasonable time after he discovered the same."

As to the sufficiency of defendant's notice under his plea of the general issue, it is said the representations alleged are unimportant and cannot furnish a basis of defense, and that nowhere in the pleadings is it stated that defendant was deceived by such representations.

The notice is quite lengthy, setting forth, amongst other things, that the contract was for the sale of a certain set of books and one city lot situated in a suburb of the city of New York contiguous to said city, of easy, quick, and inexpensive reach by steam and trolley railways every hour in the day; that plaintiff represented falsely and fraudulently, for the purpose of deceiving defendant into buying a set of books and a city lot, that only eight of said lots were allotted to residents of Muskegon; that seven had been sold and the sale to defendant must be made at once, if at all, as the agent was about to leave the city; that said city lots were rapidly increasing in value because of their proximity to the city of New York, and that they could only be sold to persons purchasing books in the same transaction; that the representations in that regard were relied upon and were the inducement governing the mind of the defendant in making the contract sued upon. Notice is given that upon the trial defendant will prove facts, which are stated in detail, absolutely to the contrary of the representations plaintiff is alleged to have made, and show that such representations were in fact false, untrue, and fraudu-

lent; that defendant subsequently learned they were false, repudiated the contract, and offered to return the books which plaintiff had sent him, making no claim for the $4 which he had already paid.

The notice, taken as a whole, makes very plain defendant's claim that he relied upon and believed a material statement of facts which was untrue; that he was deceived thereby and thus induced to sign the contract sued upon; that he was not then in a position to investigate as to the truth or falsity of such statement, and was led to believe that he must act promptly or the flattering opportunity to secure desirable property in close proximity to New York at a low price would be lost to him. The claim that these alleged false statements were no more than the expression of an opinion, or the ordinary "puffing" used by salesmen generally, is not tenable. Certain of them are distinct statements of physical facts and past events to which opinion and conjecture have no application within the meaning of the authorities relative to salesmen lauding their wares.

Plaintiff's assignment of error and argument, in the main, are founded on the well-settled rule of law that parol evidence which tends to vary, alter, extend, or contradict an unambiguous contract in writing between the parties is incompetent. Many authorities which are clear and unquestionable are cited in support of that doctrine, and it is contended that all testimony as to representations made by Waters at the time or before the order was signed, and as to the truth or falsity of such representations, was therefore inadmissible. Assuming that the contract sued upon was valid, this contention is sound; but the issue towards which such evidence was directed was the existence of a valid contract. It is claimed by the defense that the contract declared upon was void by reason of fraud in its inception, and the testimony objected to was introduced to prove the fraud. We

think it was admissible on that issue and for that purpose only. If a fraud vitiating the contract was not shown, such testimony could not be considered further, and the written contract must speak for itself and control the rights of the parties.

In the case of *Phelps* v. *Whitaker*, 37 Mich. 72, involving a written order for a windmill, it was said:

"The representations by Finch, and those contained in the printed circular, made to and shown defendant, during the negotiations for the sale, and which resulted in the order being given, were clearly admissible in evidence, and the written order of defendant did not constitute such a contract in this case as would exclude this evidence. Every principle, both of law and justice, should hold a party bound by, and responsible for, the representations, whether oral or written, which he holds out, and relying upon which a party gives an order, as in this case."

In *Peck* v. *Jenison*, 99 Mich. 326 (58 N. W. 312), involving a written order for a cash register, which defendants afterward refused to accept and pay for, the court said, in affirming a judgment for defendants, discussing the matter of oral representations and the trial court's instructions relative to rescinding the contract by reason of them:

"It is contended by counsel for plaintiff that the court was in error in these instructions, on the grounds:

"That the contract provided that the order should not be countermanded, and also that 'all claims for verbal agreements not embodied herein are waived.' It is said that the testimony given, and the instructions of the court thereunder, changed the terms of the written contract, and therefore the testimony was not admissible and the charge of the court was erroneous. The testimony was not offered or received for this purpose, and the court did not submit the case to the jury upon that theory. The claim was that the order was procured by fraud, and, if so, the defendants would have the right to rescind on that ground."

In *Lyon* v. *Lindblad,* 145 Mich. 588 (108 N. W. 969), involving a written agreement for purchase of certain jewelry, which the purchaser refused to accept and offered to return, it was said:

"The evidence to show fraud and misrepresentations in the sale was properly received, as was also the evidence tending to show the character and quality of the goods by expert witnesses."

Defendant was allowed to introduce evidence by another witness of similar representations and inducements made to him by Waters when soliciting his order in Muskegon at about the same time, and this is assigned as error. In case of fraud a wide range of examination is allowed, and we do not think this examination went beyond the scope of inquiry recognized. In *Stubly* v. *Beachboard,* 68 Mich. 401 (36 N. W. 192), it is said:

"The question before the jury was, Were these things true which plaintiff claimed; had the defendants knowledge of the fact that all these lands were worthless, and the mortgages and notes no better than blank paper upon which they were written? We think the McCarl case was competent to show them engaged in a similar transaction with other parties about that time for the purpose of showing their fraudulent intent."

In *Cook* v. *Perry,* 43 Mich. 623 (5 N. W. 1054), it is held that in an action for fraud evidence is admissible to show defendant made the same representations to others, after the fraud complained of, as tending to identify the agency by which the fraud was perpetrated and show that plaintiff had not misunderstood or misrepresented the statements alleged to be fraudulent.

Plaintiff's counsel contend that defendant is precluded by laches from interposing the defense of fraud under the rule of law that a buyer on receipt of goods must promptly return the same and give notice of rescission if he desires to avail himself of any reason

he has therefor. It is in evidence that on receipt of the books defendant promptly gave notice of cancellation of the order and offered to return the property; that later, in response to notice from plaintiff of its purpose to hold him to the contract, he repeated his notice in emphatic terms, calling attention to his previous communication, again repudiating the contract; that he did not fully learn of the nature of Middlesex Downs and the extent of the imposition practiced upon him until this action was brought, when he entered his appearance, pleaded the general issue with notice of his special defense within the required time, and again tendered return of the books, in the notice under his plea. Plaintiff was early advised that defendant rescinded the contract and refused to perform on his part. We think under the facts shown he was not, as a matter of law, barred by laches from making the defense he relies on.

Error is assigned to the charge as a whole on the ground that a verdict should have been directed for plaintiff and against certain portions of the charge as unsound, prejudicial, and misleading. It is especially urged as error that the court "left it to the jury to construe the written contract and infer that the right of either party to a verdict depended upon the correctness of his theory as to whether the lot was a premium gift or otherwise"; the court having in the course of the charge stated it was the theory of plaintiff that the lot mentioned in the contract was a bonus or gift, while defendant claimed it was bought with the books and the consideration covered both. While this was perhaps immaterial, it did not, in the light of the charge taken as a whole, in any wise leave it to the jury to construe the contract. The construction of the contract was not an issue in the case, nor the issue submitted to the jury. By its terms it was unequivocal as to defendant—as strong and binding on him as legal phraseology could make it. If not vitiated

by fraud, he had no defense. It sought, so far as possible, to exclude even that defense. The inherent infirmity underlying plaintiff's case is not in the contract, but in the nature of the scheme to which the contract relates. It is indicated by the record that, to make this ingenious vending project successful, it must be pushed by prevarication. Though it may be difficult to conceive how the most inexperienced and simple-minded would err therein or be deceived thereby if the proposition was truthfully presented, yet, if such was the case and the order signed, the contract would be enforceable according to its terms.

The court throughout the charge recognized this contract as valid and enforceable unless obtained by deceit, false representations, and fraud, instructed the jury that they could only find in favor of defendant in case his claim of fraud was established by a preponderance of evidence, and specifically stated the amount of the verdict which they must render, as shown by the contract, if they found for plaintiff. Early in the charge the jury were instructed as follows:

"The contract was executed as is alleged by the plaintiff. Now, the defense being a special one, an affirmative defense, the burden is upon the defendant to show to your satisfaction, by a reasonable and fair preponderance of the evidence, that he has been defrauded as he alleged."

This principle was reiterated three times. Returning to that subject later, the court said:

"I charge you, gentlemen of the jury, that it is an elementary principle that he who imputes a transaction as fraudulent, which may or may not be so, is not sustained by his own assertion alone in case he is disputed, but he has the burden on him to make his allegation good by independent evidence, for he who alleges the transaction was fraudulent must prove it. He cannot be heard to say, after suit was brought in this case, that 'I will not pay you because in the

original instance there was fraud,' and by his own assertion prove that fraud. He must satisfy you by a fair preponderance of the evidence, exclusive of his own testimony, that such fraud existed at the time he alleges."

If there is any error in this instruction it certainly is not prejudicial to the plaintiff. The only defense in this case which raises the one issue of fact is that the contract was void, at the option of defendant, because induced by false and fraudulent representations made by plaintiff's agent. We think the court clearly advised the jury that the case turned on that issue, instructing them as to the burden of proof, what facts were for them to decide, what rules of law they should bear in mind when passing upon the testimony, and what verdict they should render according to the facts as they might decide them. Considering the charge as an entirety, we find no reversible error.

The judgment is affirmed.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.